**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AEL FINANCIAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 C 404 |
| | ) | |
| COUNTRYSIDE PUBLISHING CO., | ) | |
| INC., ELEASE FUNDING, INC., | ) | |
| JAMES SPRECHER, JOSEPH GLENNON, | ) | |
| GERALD P. RIGGIN a/k/a JERRY | ) | |
| RIGGIN, and GOVERNMENT | ) | |
| VERIFICATION LLC a/k/a | ) | |
| GOVERNMENT VERIFICATION LLC | ) | |
| d/b/a THE VERIFICATION COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Before the court are the cross-motions for summary judgment of plaintiff AEL Financial, LLC ("AEL") and defendant eLease Funding, Inc. ("eLease"). For the reasons explained below, we deny the parties' motions.

**BACKGROUND**

Defendant eLease brokers equipment loans. (eLease's Stmt. of Material Facts (hereinafter, "eLease Stmt.") ¶ 3.) It obtains funding for the loans from companies like plaintiff AEL. (Id. at ¶ 4.) In 2008, defendant Countryside Publishing Company ("Countryside") sought (or purported to seek) financing to purchase computer and telephone equipment from Government Verification LLC

d/b/a The Verification Company ("TVC").[1] (See AEL's Stmt. of Facts (hereinafter, "AEL Stmt.") ¶ 7.) According to an itemized proposal dated March 26, 2008, TVC proposed to sell Countryside a "Centralized Telecom Management System" for $315,833.00. (See Centralized Telecom Mgmt. Proposal, attached as Ex. 2 to Aff. of Nick Kondras (hereinafter "Kondras Aff."), attached as Ex. A to AEL Stmt.)[2] The proposal was executed by defendant Jerry Riggin, who was identified in the proposal as TVC's "Vice President Operations." (Id. at 2.) Countryside was an existing eLease client, (see AEL Stmt. ¶ 14), and evidently approached eLease to obtain financing for the TVC transaction. On or about March 27, 2008, Countryside entered into an Equipment Finance Agreement ("EFA") with eLease (as "Lender") to borrow an unspecified "Collateral Advance" to acquire the equipment listed in an attached schedule (the "Equipment"). (See EFA, attached as Ex. 5.1 to eLease Stmt.; Schedule A to EFA, attached as Ex. 5.2 to eLease

---

[1] Countryside published marketing materials (e.g., brochures) for the construction industry. (See eLease Stmt. of Add'l Facts ¶ 2; see also Dep. of James Sprecher ("Sprecher Dep."), attached as Ex. 2 to eLease Stmt. of Add'l Facts, at 24, 38.) According to James Sprecher, one of the company's principals, Countryside wanted the equipment to conduct cold calls to contractors. (See Sprecher Dep. at 38.)

[2] eLease repeatedly objects to Kondras's affidavit on the grounds that he is a "business records custodian" without personal knowledge of the Countryside transaction. (See, e.g., eLease Resp. to AEL Stmt. ¶ 7.) In his affidavit, Kondras sometimes strays into matters that predate his tenure at AEL and that are not strictly based upon the underlying documents. (See, e.g., Kondras Aff. ¶ 31 ("*Unbeknownst to AEL*, JAMES SPRECHER and JOSEPH GLENNON, the managers and insiders of Countryside, were authorized signers on the TVC Account.") (capitalization in the original; italics added).) But it is apparently undisputed that he is competent to lay a foundation to introduce the documents attached to his affidavit into evidence as business records. (See Kondras Aff. ¶¶ 8-9, 11.)

Stmt.) Although AEL was not yet a party to the transaction, it drafted the EFA form and provided it to eLease. (See eLease Stmt. ¶ 20.) Pursuant to the EFA, Countryside agreed to repay eLease over a period of 36 months, and granted eLease a first priority security interest in the Equipment to secure payment. (See EFA at 1; see also id. at 2, ¶ 7 ("SECURITY INTEREST; RECORDING").) Yvonne Shawn, Countryside's president, executed the agreement on Countryside's behalf and agreed to personally guarantee the company's performance. (See EFA at 1.) Four days later, Countryside executed a letter agreement — also drafted by AEL — authorizing eLease to pay TVC $157,916.50 "even though some or all of the collateral [had] not been delivered to and/or accepted by" Countryside. (See Authorization Letter, executed March 31, 2008, attached as Ex. 7 to eLease Stmt.; see also eLease Stmt. ¶ 20.) On April 3, 2008, AEL sent a letter to eLease preliminarily approving financing in the amount of $295,000 subject to further due diligence and other conditions. (eLease Stmt. ¶ 14; see also Letter from J. Baltey to T. Williams, dated Apr. 3, 2008, attached as Ex. 8 to eLease Stmt.) The following week, Countryside and eLease amended the EFA to reflect a "Collateral Advance" of $315,833.00. (See eLease Stmt. ¶ 19; see also Amend. No. 1 to EFA, attached as Ex. 9 to eLease Stmt.)

eLease assigned the EFA to AEL on April 11, 2008. (See
Assignment, dated Mar. 31, 2008, attached as Ex. 10 to eLease
Stmt.)[3] In the Assignment, eLease represented and warranted that:

> (i) the Agreements and all related instruments are
> genuine, enforceable and duly authorized . . . (iii) all
> statements made by [eLease] regarding the Agreements and
> Property are true; (iv) the Property described in the
> Agreements has been delivered to, and accepted by, the
> respective lessees . . . .

(Assignment.)[4] AEL wired $157,916.50 to TVC's bank account on the
same day that it executed the Assignment. (See AEL Stmt. ¶ 31.)
A June 3, 2008 invoice from TVC to Countryside reflects a
$157,916.50 "deposit," half the total amount due. (See TVC Invoice,
dated June 3, 2008, attached as Ex. 6 to eLease Stmt.) On June 4,
2008, eLease's Vice President, Mark Williams, emailed Jerry Bertsch
at Countryside an "Acceptance Certificate," also drafted by AEL.
(See AEL Stmt. ¶ 34; eLease Stmt. ¶ 20; see also Email from M.
Williams to J. Bertsch, dated June 4, 2008, attached to Dep. of
Mark Williams, attached as Ex. D to AEL Stmt. ("Attached is the
'Acceptance Certificate' for Yvonne Shawn to sign off on for the
job. Please have signed, faxed back, and we'll arrange the final
'verbal authorization' to commence immediately.").) The following

---

[3] The Assignment purports to be dated March 31, 2008, but the parties did
not execute the agreement until the following week. (See Assignment at 1.) The
parties effectively agree that the Assignment became effective when it was fully
executed on April 11. (See AEL Resp. to eLease Stmt. ¶ 21; eLease Stmt. ¶ 23
(stating that "AEL took the assigment on April 11, 2008").)

[4] At this point, AEL had already filed a UCC financing statement in its
capacity as "lender/secured party" under the EFA. (See Financing Statement,
filed April 8, 2008, attached as Ex. 11 to eLease Stmt.)

day, Shawn executed the Acceptance Certificate acknowledging
receipt of the Equipment:

> I, acting on behalf of the Borrower named above,
> acknowledge that I have personally inspected all
> Equipment described in the above referenced Agreement
> [the EFA]. The Equipment has been received, inspected
> and installed to Borrower's satisfaction and is complete,
> operational and in good condition and working order and
> satisfactory in all respects and conforms to all
> specifications in the Agreement and the Supply Contract.
> Borrower hereby accepts the Equipment and acknowledges
> that, unless otherwise provided in the Agreement, the
> Agreement commences on the Date of Acceptance stated
> below. Borrower further acknowledges that this Agreement
> is NON-CANCELABLE, ABSOLUTE AND IRREVOCABLE. I
> understand that Lendor [sic] will, and Borrower hereby
> authorizes Lendor [sic] to, purchase the Equipment in
> reliance on this Acceptance Certificate. I am authorized
> to sign this Acceptance Certificate on Behalf of
> Borrower.

(See Acceptance Certificate at 1.) On June 6, 2008, AEL wired the
remaining $157,916.50 to TVC. (AEL Stmt. ¶ 36.) Countryside made
approximately $203,000.00 in installment payments before defaulting
in September 2010. (Id. at ¶ 41.) At the time of Countryside's
default, it owed AEL $168,319.38 ($142,064.72 in future payments
due, $21,181.91 in past due payments, and $5,073.75 in late
charges). (Id.)

The Assignment does not require eLease to indemnify AEL for a
simple default. However, AEL contends that it is the victim of a
fraud implicating several of eLease's representations and
warranties. Yvonne Shawn was Countryside's President in name only.
She planned parties and executed documents when they were brought

to her by the people who actually ran the company, including Gary Sizemore, Jerry Bertch, Pam Sprecher, Joe Glennon, and James Sprecher. (AEL Stmt. ¶ 10; <u>see also</u> Dep. of Yvonne Shawn ("Shawn Dep."), dated Mar. 16, 2011, at 29-30, 43-44.) James Sprecher, Shawn's husband in 2008 (<u>see</u> Shawn Dep. at 12-13), was convicted of bank fraud in 1996 in the United States District Court for the Middle District of Florida. (<u>See</u> AEL Stmt. ¶ 13.)[5] Although none of the transaction documents disclosed any affiliation between Countryside and TVC, Sprecher testified that Countryside (or an entity affiliated with Countryside) purchased TVC in 2008. (<u>See</u> Sprecher Dep. at 36, 39, 96-98; <u>but see</u> <u>id.</u> at 40 (backing off of his earlier testimony that the acquisition occurred "well before" the eLease/AEL transaction).) Moreover, Sprecher and Glennon controlled the TVC account to which AEL wired the Equipment purchase price.[6] (AEL Stmt. ¶ 32; <u>see also</u> Dep. of Patricia Truluck, attached as Ex. I to AEL's Stmt., at 11.) On April 18, 2008, seven days after it received the first $157,916.50 installment from AEL, TVC transferred $45,000.00 to Countryside.

---

[5] eLease purports to dispute this fact, suggesting that the "James D. Sprecher" of Palm Harbor, Florida in the court record attached to AEL's statement of facts may not be the James D. Sprecher of Palm Harbor, Florida involved in this case. (<u>See</u> eLease Resp. to AEL Stmt. ¶ 13.) This argument, which is unsupported by any evidence, is frivolous. (<u>Compare</u> Sprecher Dep. at 4, 7 (identifying himself as "James D. Sprecher" and listing his address as 2256 Toniwood Lane, Palm Harbor, Florida, 34685), <u>with</u> Crim. Dkt. in <u>United States v. James D. Sprecher</u>, attached as Ex. G to AEL Stmt.(identifying the defendant as James D. Sprecher residing at 2270 Toniwood Lane, Palm Harbor, Florida, 34685); <u>see also</u> Shawn Dep. at 53 (referring to Sprecher's felony conviction).)

[6] We dismissed AEL's claims against Sprecher and Glennon for lack of personal jurisdiction.

(AEL Stmt. ¶ 33.)  On June 9, 2008, three days after it received the second $157,916.50 installment, TVC transferred $158,000.00 to Countryside.  (<u>Id.</u> at ¶ 38.)

After Countryside defaulted, AEL demanded that Countryside return the Equipment.  (<u>Id.</u> at ¶ 42; <u>see also</u> EFA at 2, ¶ 9.)  AEL contends that Countryside did not comply because most of the Equipment never existed.  TVC purported to charge Countryside $148,920.00 for Dell computer equipment.  (<u>See</u> AEL Stmt. ¶ 18.) Sandra Brooks, a Dell paralegal, searched Dell's records and confirmed that a company identified as "Verification Co." purchased six products from Dell in May 2008 matching serial numbers listed in TVC's June 3, 2008 invoice. (<u>See</u> <u>id.</u> at ¶ 44; <u>see also</u> Aff. of Sandra Brooks, attached as Ex. C to Dep. of Sandra Brooks, attached as Ex. J to AEL's Stmt. ("Brooks Dep."), ¶ 7.)  The serial numbers listed for four other products are not actual Dell serial numbers. (<u>See</u> Brooks Dep. at 14 ("The names refer to Dell systems, but the products — the numbers provided are not Dell service tags.").)  The invoice does not list serial numbers for the 96 "Dell Vostro Desktops," which account for $72,192.00 of the $148,920.00 that TVC purported to charge Countryside for Dell equipment.  But Brooks was able to use information gleaned from the purchases she was able to verify — specifically, TVC's name and telephone number — to search for other orders placed by the same company.  (<u>See</u> Brooks Dep. at 19-20.)  Using this information, Brooks was unable to find any

record that "Verification Co." purchased the 96 Vostro Desktops
from Dell. (See id. at 17-18.) In total, Brooks was able to
confirm that "Verification Co." purchased only $64,640.00 of
equipment from Dell. (See AEL Stmt. ¶ 44.)[7] Countryside also
purported to purchase $50,493.00 of "Vicidial" equipment from TVC.
(AEL Stmt. ¶ 19.) Vicidial offers its telecommunications software
for free — it makes money selling consulting, training, and other
services. (See Dep. of Matt Florell ("Florell Dep."), attached as
Ex. K to AEL Stmt., at 6.) It does not permit third parties to
sell licenses to use its free software. (Id. at 16-17.) It does
sell server equipment, (see id. at 17-18), but not under its own
brand name and it could not find any equipment orders placed by TVC
in its records. (AEL Stmt. ¶ 50.)

eLease contends that the Equipment was delivered to
Countryside, or at least that there is a material dispute about
whether it was or not. (See, e.g., eLease Stmt. of Add'l Facts ¶¶
25-26.) First, it relies on testimony from Gary Sizemore,
Countryside's in-house counsel, who testified that Countryside
installed a new "dialer system" for its telephone representatives

---

[2]/ eLease quibbles with some aspects of Brooks's testimony. (See eLease
Resp. to AEL Stmt. ¶ 18.) For example, eLease contends that Brooks stated that
she "could not search for an order of equipment without serial numbers." (Id.;
see also id. at ¶ 48.) Brooks testified that she could not search for orders by
product name (e.g., "Vostro") without serial numbers. (See Brooks Dep. at 21-22.)
But she was able to search for other orders placed by the same company, and using
that method she was unable to find any other purchases by "Verification Co."
corresponding to the products listed in the invoice. (See id. at 20, 22.)
eLease also points out that Brooks could not recall whether she had searched for
the name "Riggin." (See eLease Resp. to AEL Stmt. ¶ 18.) But it has not cited
any grounds for suspecting that Riggin would have ordered products in his own
name.

in or around June 2008. (See eLease Stmt. of Add'l Facts ¶ 25; see also Dep. of Gary Sizemore ("Sizemore Dep."), attached as Ex. 11 to eLease Stmt. of Add'l Facts, at 27-33, 171-75.) But he did not know whether the equipment that Countryside installed in 2008 was the equipment identified in TVC's proposal and invoice from that same time period. (See Sizemore Dep. at 173-74.) eLease also relies on James Sprecher's testimony in Yvonne Shawn's bankruptcy case. (See eLease Stmt. of Add'l Facts ¶ 26.) As Sprecher describes it, Jerry Riggin promised to install a sophisticated call center for Countryside at the facility that the two companies shared. (See id. at 36-37, 40; see also id. at 44 (stating that TVC moved into Countryside's facility after the acquisition).) The system did not operate as promised and was "ripped out" after less than a year. (Id. at 41.) The two companies — TVC and Countryside — "separated" and TVC took at least some of the equipment with it. (Id. at 42-44.) eLease also cites an "Agreement for Termination of Consulting Agreement," dated June 3, 2009, between Morgan Fagerman (TVC's President), TVC, and Government Verification, LLC. (See Agmt. for Term. of Consulting Agmt. ("Termination Agreement"), dated June 3, 2009, attached as Ex. 15 to eLease's Stmt. of Add'l Facts.) This agreement terminates a consulting agreement between Fagerman and Government Verification dated February 14, 2008 — approximately five weeks before TVC's initial proposal to

Countryside regarding the Equipment.[8]  Pursuant to the same agreement, Government Verification also transferred certain equipment to TVC.  (See Termination Agreement ¶ 1.)  The descriptions of the equipment in the Termination Agreement are at least superficially similar to some of the equipment described in TVC's June 2008 invoice.[9]  In particular, the "PowerEdge 1950 III" and "PowerEdge R900" computers may correspond to the equipment that Dell acknowledges selling to "Verification Co." in May 2008 (although the quantities do not entirely match up, see supra n.9).  But the Termination Agreement does not include any serial numbers, making it impossible to confirm that any of the listed equipment corresponds to the equipment that TVC purportedly sold to Countryside.  Also, it is unclear how Government Verification obtained title to equipment that TVC purportedly sold to Countryside, or why Government Verification would return the equipment to TVC.

Sprecher was also vague about what equipment Countryside still had in its possession at the time of Shawn's bankruptcy in 2011.

---

[8]  The consulting agreement itself is not included in the parties' summary-judgment materials.

[9]  Among other equipment, Exhibit A to the Termination Agreement appears to list (1) two "PowerEdge 1950 III" computers; (2) one "PowerEdge R900;" and (3) two "SupMicro Intel Dual Core[s], 2.3 Ghz, 133 MHZ FSB, 4G RAM, 4 140 SAS (RAID 10 w/1 Hot Spare, *Sangoma A104X Quad T1 card.*"(See Termination Agmt. at Ex. A (emphasis added).)  (We are assuming that equipment listed more than once in the exhibit represents more than one unit, although it may be that one piece of equipment ("PowerEdge 2950 III") served two purposes ("IVR (OpenSource)" and "Storage").)  TVC's June 2008 invoice listed (1) two "PowerEdge 1950 III" computers; (2) *four* "PowerEdge R900" computers; and (3) *four* "Sangoma A104 Four-Port T1/E1/J1 Card[s]." (See Invoice, dated June 3, 2008, at 1-2.)

He testified that he asked Riggin to inspect Countryside's facility for the equipment that AEL had financed. (<u>See</u> <u>id.</u> at 43.) Sprecher's hearsay testimony about what Riggin says he found is difficult to follow. Our best guess is that, according to Sprecher, Riggin did not find any equipment from the "original package" at Countryside's facility. (<u>Id.</u> ("He identified pieces — a lot that's in the warehouse storage, but he — as far as where we're at right now, there as absolutely nothing that he recalled ever putting in or as part of that original package.").) Riggin did identify "numerous pieces" stored in an unidentified warehouse, and apparently some of that equipment was on the "original list." (<u>Id.</u> at 43-44.) But Riggin acknowledged taking "file servers." (<u>Id.</u> at 44.) In their motion to withdraw as counsel, Countryside's attorneys represented that the company filed an assignment for the benefit of creditors in 2012. (<u>See</u> Mot. to Withdraw, Dkt. 96, ¶ 2.) Neither party in this case has filed any records from that proceeding indicating what assets (if any) Countryside has to satisfy the claims of its creditors.

## **DISCUSSION**

### A.  **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In considering such a motion, the court construes the

evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party.  See <u>Pitasi v. Gartner Group, Inc.</u>, 184 F.3d 709, 714 (7th Cir. 1999).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  "Summary judgment should be denied if the dispute is 'genuine':  'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Talanda v. KFC Nat'l Mgmt. Co.</u>, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question."  <u>McGrath v. Gillis</u>, 44 F.3d 567, 569 (7th Cir. 1995).

**B.    AEL's Motion for Summary Judgment**

The elements of a claim for breach of contract are "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages."  <u>MC Baldwin Financial Co. v. DiMaggio, Rosario & Veraja, LLC</u>, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006).[10] The parties dispute the fifth and sixth elements.  AEL contends that eLease breached its representations that: (1)the Equipment had

---

[10]/  The parties agree that AEL's claim is governed by Illinois law pursuant to the Assignment's choice of law provision.  (<u>See</u> Assignment at 1.)

"been delivered to, and accepted by," Countryside; and (2)the EFA "and all related instruments" were "genuine" and "enforceable."

**1.    Whether the EFA and All Related Documents Were Genuine**

An instrument is "genuine" if it is "free of forgery or counterfeiting." Black's Law Dictionary at 755 (9th Ed. 2009). "[F]orgery, under Illinois law, includes any alteration or false writing in an instrument made for the purpose of defrauding a transferee of the instrument." Roodhouse Nat'l Bank v. Fidelity and Deposit Co. of Maryland, 426 F.2d 1347, 1349 (7th Cir. 1970) (citing People v. Mau, 36 N.E.2d 235 (Ill. 1941) and People v. Kubanek, 19 N.E.2d 573 (Ill. 1939)).  In Roodhouse, a used car dealer assigned vehicle installment contracts to the plaintiff in exchange for credit.  Id. at 1348.  The installment contracts were fraudulent — the purchaser and the car associated with each contract were fictitious.  Id. Construing Illinois law, the Court held that the false installment contracts constituted "forgery" within the meaning of an insurance bond issued by the defendant. Id. at 1349.  Similarly, in Capitol Bank of Chicago v. Fid. & Cas. Co. of N.Y., 414 F.2d 986, 988 (7th Cir. 1969), the Court held that offering falsified accounts receivable as collateral for a loan constituted "forgery."  On AEL's theory of the case, Countryside and TVC falsified the initial proposal, Schedule A to the EFA, the June 3, 2008 invoice, and the Acceptance Certificate to fraudulently obtain credit from AEL.  If AEL is correct, then we

agree that the just-cited cases support its argument that the documents are not "genuine."

eLease does not attempt to distinguish these authorities, arguing instead that the representations and warranties in the Assignment are not binding. AEL approved the financing arrangement before the parties executed the Assignment. (*See* eLease Stmt. ¶ 14.)[11] So, according to eLease, the Assignment "was a mere formality to complete a transaction which was already approved by AEL." (eLease Resp. at 6.) We disagree. The fact that AEL pre-approved the transaction does not render the agreements memorializing the transaction a nullity. eLease, as "Lender," executed the EFA and then executed a separate agreement (the Assignment) transferring the EFA and related documents to AEL. There is no basis in the record to excuse eLease, a sophisticated party, from honoring the terms of agreements that it voluntarily executed. If eLease was dissatisfied with the provisions of AEL's form agreements, it should have negotiated different terms or simply not done business with AEL. Similarly, we reject eLease's argument that the representations and warranties are irrelevant because AEL did not rely on them when it made payments to TVC. (*See* eLease Resp. at 6-

_____

[11] eLease contends that AEL verbally approved the transaction even before eLease and Countryside executed the EFA. (*See* eLease Resp. at 6 (citing Aff. of J. Thomas Williams, attached as Ex. 12 to eLease's Stmt. Add'l Facts, ¶ 54).) But eLease did not include this fact in its Rule 56.1 statements. So, we will not rely on it in ruling on the parties' motions. *See, e.g.*, *Byrd-Tolson v. Supervalu, Inc.*, 500 F.Supp.2d 962, 966 (N.D.Ill. 2007) ("[F]acts are properly presented through the framework of the Rule 56.1 statements, and not through citation in the briefs to raw record material.").

7.)  First, AEL's prior approval is not inconsistent with reliance on the Assignment's terms.  Countryside executed the letter agreement authorizing eLease to make the initial payment to TVC on March 31, 2008, but AEL did not wire any money to TVC until April 11, 2008 — the same day that it executed the Assignment.  Indeed, it would have been absurd for AEL to pay a large sum of money to Countryside without first entering into the Assignment and obtaining the contractual right to repayment.  Second, and more importantly, reliance is not an element of breach of contract.  See MC Baldwin Financial, 845 N.E.2d at 30.  eLease warranted that the EFA and related documents were "genuine."  If they were not, then AEL is entitled to recover from eLease any damages caused by the breach.

The real issue is whether the EFA and related documents are so clearly "false writings" that we can take the issue away from a jury and decide the question as a matter of law.  TVC's proposal and invoice purport: (1) to charge $9,600 for licenses to use software available for free on the Internet; (2) to sell "Vicidial" branded equipment that does not exist; and (3) to sell Dell equipment with apparently fabricated serial numbers.  Vicidial has no record of any sales to TVC, and Dell can account for only some of the equipment listed on the invoice.  When combined with Sprecher's criminal background, Shawn's figurehead status within the company, the undisclosed affiliation between TVC and

Countryside, and the suspicious transfers between those two companies, the inference of fraud is quite strong. On the other hand, Countryside represented that it had received the Equipment and repaid AEL approximately $203,000.00 before eventually defaulting. These facts certainly do not rule out fraud, (see infra), but they may indicate that the financing transaction was legitimate. See Berry v. Chicago Transit Auth., 618 F.3d 688, 691 (7th Cir. 2010) ("It is not for courts at summary judgment to weigh evidence or determine the credibility of [a witness's] testimony; we leave those tasks to factfinders."). Dell did sell some of the Equipment to TVC, and Sizemore and Sprecher testified that TVC installed a call center for Countryside in 2008. Finally, the record is notable for what is missing. There is no testimony from Riggin or any other officer of TVC to shed light on its role in the transaction. For example, there is no evidence in the record about how TVC generated the equipment lists in the invoice and the EFA. And there is no evidence that any third party inspected Countryside's facility to verify its representation that it had received the Equipment. (Cf. Letter from J. Baltey to T. Williams (letter from AEL preliminarily approving the Countryside loan subject to "review and approval of the Equipment and vendors with a verbal confirmation, and if necessary, an Equipment field audit").) If TVC sold and delivered the Equipment to Countryside, then the transaction was "genuine," even if the parties later acted

in ways that frustrated AEL's attempts to obtain repayment (e.g., by removing the equipment).

All of AEL's arguments are based on its theory that the Countryside transaction was a sham. So, our holding with respect to the "genuineness" of the transaction also provides a basis for denying AEL's motion with respect to the EFA's other terms. But more fundamentally, as we discuss below, we disagree with AEL's interpretation of those other terms in the context of the entire transaction.

**2. Whether eLease Breached Its Representation that the Equipment had "Been Delivered to, and Accepted by," Countryside**

eLease represented and warranted in the Assignment that the Equipment "has been delivered to, and accepted by, the respective lessees . . . ." eLease contends that the parties mistakenly included this term in the Assignment. (<u>See</u> eLease Mem. at 11.) "A reformation of a contract is proper when 'at the time the [contract] was reduced to writing and executed, some agreed-upon provision was omitted or one not agreed upon was inserted either through mutual mistake or through mistake by one party and fraud by the other.'" <u>Luza v. JPMorgan Chase Bank, N.A.</u>, No. 09 C 7709, 2010 WL 2836705, *3 (N.D. Ill. July 15, 2010) (quoting <u>Wheeler-Dealer, Ltd. v. Christ</u>, 885 N.E.2d 350, 355 (Ill. App. Ct. 2008)). The party proposing the modification has the burden to show the parties' mutual mistake by clear and convincing evidence.

Wheeler-Dealer, 885 N.E.2d at 355. On March 31, 2008, Countryside
executed a letter agreement, on a form provided by AEL, authorizing
eLease to make an initial payment to TVC "as if all the Collateral
had been delivered to and accepted by Debtor as of [March 27,
2008]." (See Authorization Letter (emphasis added); see also id.
("[Countryside] hereby authorizes [eLease] to make payment in the
amount of $157,916.50 to The Verification Company, Inc. ("Vendor")
covering the Collateral listed on [the EFA] *even though some or all
of the Collateral has not been delivered to and/or accepted by
Debtor*.") (underlining in original; italics added). Between the
execution of this document and the execution of the Assignment
containing the delivery representation on April 11, 2008, TVC did
not purport to deliver, and Countryside did not purport to accept,
the Equipment. Countryside did not execute the Acceptance
Certificate until June 5, 2008. AEL insists that eLease breached
the delivery representation, but it does not explain — or even
attempt to explain — why eLease would represent that the equipment
was delivered when both parties knew that was not true. Given the
sequence of events, the only plausible explanation for the delivery
representation is that parties executed AEL's form agreement
without making a change conforming the Assignment to the actual
transaction. We conclude that eLease has shown, by clear and
convincing evidence, that the parties mistakenly included the

delivery representation in the Assignment and reform the contract to exclude that term.

### 3. Whether eLease Breached its Representation that the EFA was "Enforceable"

eLease also represented and warranted that the EFA and related instruments were "enforceable." Pursuant to the EFA, Countryside granted eLease (and later AEL) a security interest in the Equipment. According to AEL, because the Equipment did not exist, its security interest in the Equipment was not "enforceable." (See AEL Mem. at 13.) There is no dispute that Shawn had the legal authority to enter into the EFA and bind Countryside to its terms. If, as AEL contends, the Equipment never existed, then AEL has the right to pursue damages against Countryside for breach of contract. So, the EFA is "enforceable," even if as a practical matter AEL cannot exercise all of its rights under the agreement. We conclude, as a matter of law, that eLease did not breach its representation that the EFA and related documents were "enforceable."

## C. eLease's Cross-Motion for Summary Judgment

For the reasons we have already discussed, we reject eLease's attack on the sufficiency of AEL's evidence. A reasonable jury could conclude that the Countryside transaction was a sham in violation of eLease's warranty that the EFA and all related documents were "genuine." (See supra.) We also reject eLease's argument that AEL waived its rights under the Assignment. Although

it is not entirely clear from its brief, we understand eLease to argue that AEL waived its right to pursue eLease for breach of contract by (1) accepting payments from Countryside, and (2) failing to notify eLease of problems with the transaction before filing this lawsuit. As we said earlier, Countryside's payments may indicate that the EFA was genuine and that the company defaulted because it fell on hard times. Or they may have been part of a Ponzi-like scheme to obtain credit by fraud while maintaining the appearance of propriety by make some payments on the debt. That is for a jury to decide. With respect to the notice issue, there is no evidence that AEL had any inkling that something was awry before Countryside defaulted in September 2010. In January 2011, AEL filed a straightforward complaint against Countryside for breach of contract, replevin, and detinue. AEL only joined eLease as a defendant after it amended its complaint to allege the underlying fraud and after it demanded that eLease repurchase the loan for breaching the "genuineness" representation. (See AEL Stmt. ¶ 53.) The fact that AEL did not assert rights that it did not know it had does not support waiver.

**D.  Damages**

Finally, the parties dispute the proper measure of damages should AEL establish eLease's liability. AEL contends that it is entitled to the entire amount of the unpaid debt plus late charges. (See AEL Mem. at 13-14.) eLease responds that the proper measure

of expectation damages is the resale value of the Equipment rather than the unpaid portion of the loan. <u>See</u> Rest. (Second) Cont. § 347 cmt. 1 (1979) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed."). As eLease points out, it did not guarantee that Countryside would never default on its obligation to pay AEL. Instead, it represented and warranted that the EFA and related documents were "genuine," which in this case means that the Equipment existed and could be sold to offset AEL's losses in the event of a default. So, we think that eLease has raised a significant objection to AEL's damages calculation. However, this issue is undeveloped in the briefs. We will reserve ruling at this time regarding the proper measure of damages.

## **CONCLUSION**

AEL's motion for summary judgment [125] is denied. eLease's motion for summary judgment [129] is denied. There is a material factual dispute about whether eLease materially breached its representation that the EFA and related documents were "genuine." Pursuant to Federal Rule of Civil Procedure 56(g), the court finds that: (1) eLease did not breach its representations that the EFA and related documents were "enforceable;" and (2) the parties

mistakenly included a representation that TVC had already delivered the Equipment to Countryside on the date of the Assignment. The court reserves ruling on the proper measure of damages. A status hearing is set for November 13, 2013 at 10:30 a.m. to set a trial date.


DATE:     November 1, 2013


ENTER: _____
          John F. Grady, United States District Judge